SEALED

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: 5:16CR00008 |
| v. | |
| JASON BRADLEY | **UNDER SEAL** |
| DEBORAH BRADLEY | |
| aka Deborah Ryba | Title 18 U.S.C. Section 1956(h) |
| RYAN BUCHANAN | Title 21 U.S.C. Section 846 |
| BRIAN LISTER | Title 21 U.S.C. Section 963 |
| NICHOLAS PURINTUN | |
| NANYA TAYLOR | |
| EDWARD TAYLOR | |

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE
### [Drug Trafficking Conspiracy]

1.    From in or about March, 2011, to in or about October, 2015, in the Western District of Virginia, and elsewhere, the defendants,

**JASON BRADLEY,**
**DEBORAH BRADLEY,**
**RYAN BUCHANAN,**
**BRIAN LISTER,**
**NICHOLAS PURINTAN,**
**NANYA TAYLOR, and**
**EDWARD TAYLOR**

and others, knowingly and intentionally conspired with each other and with other persons, known and unknown to the Grand Jury, to knowingly and intentionally possess with the intent to distribute, and distribute, one or more controlled substances (which included one or more Schedule I controlled substances and one or more controlled substance analogues), in violation

*USAO # 2016*

1

of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C).

    a.   One of the controlled substances was 3,4-methylenedioxypyrovalerone (MDPV), which was a controlled substance analogue as defined in 21 U.S.C. § 802(32), with the intent that it be used for human consumption, as provided in Title 21, United States Code, Section 813, from May 1, 1992, until on or about October 21, 2011, at which time MDPV became a Schedule I controlled substance under the Controlled Substances Act (CSA). 76 Federal Register 65371 (October 21, 2011);

    b.   One of the controlled substances was α-Pyrrolidinovalerophenone (α-PVP), which was a controlled substance analogue as defined in 21 U.S.C. § 803(32), with the intent that it be used for human consumption, as provided in Title 21, United States Code, Section 813, from October 21, 2011 until on or about March 7, 2014, at which time α-PVP became a Schedule I controlled substance under the CSA. 79 Federal Register 12938 (March 7, 2014).

### Manner and Means

2.     The substance MDPV was a controlled substance analogue ("synthetic drug") from May 1, 1992 until on or about October 21, 2011, at which time MDPV became a controlled substance by final order of the Administrator of the Drug Enforcement Administration (DEA). 76 Federal Register 65371 (October 21, 2011).

3.     The substance α-PVP was a controlled substance analogue from October 21, 2011 until March 7, 2014, at which time α-PVP became a controlled substance by final order of the Administrator of the DEA. 79 Federal Register 12938 (March 7, 2014).

4.     Beginning in or around March 2011, the defendants and other members of the

conspiracy conspired with each other and others to import from China and other locations, possess with the intent to distribute, and distribute, MDPV and α-PVP. MDPV and α-PVP have a stimulant and hallucinogenic effect on the central nervous system similar to or greater than the stimulant effect on the central nervous system of a schedule I controlled substance. They did so with the intent that the MDPV and α-PVP be used for human consumption.

5.    In or about March 2011, members of the conspiracy met in the Chicago area and agreed to start importing one or more controlled substance analogues from China and distribute them to others in the United States for human consumption. One member of the conspiracy who attended this meeting (and died in the summer of 2015) had a cousin – defendant DEBORAH BRADLEY (hereinafter "RYBA") – who lived in Asia and could help the other members of the conspiracy obtain synthetic drugs from sources in China with the assistance of her husband, defendant BRADLEY, and others.

6.    Defendants BRADLEY and RYBA lived in Thailand and China along with other members of the conspiracy, and arranged to obtain controlled substances and controlled substance analogues from sources in China. BRADLEY and RYBA also arranged for the synthetic drugs to be shipped back to other members of the conspiracy in the United States, including defendants BUCHANAN and the now-deceased member of the conspiracy (Conspirator A) and others, who repackaged and redistributed the synthetic drugs to sub-distributors in locations throughout the United States, including the Western District of Virginia, New York, Illinois, Pennsylvania, Oregon, North Carolina, South Carolina, Georgia, Texas, Ohio and Michigan.

7.    From in or about April 2011 to in or about August 2011, defendant RYBA, using email account deborahryba@gmail.com, sent and received emails inquiring about prices and

availability of various chemicals, including MDPV. In one email dated April 2, 2011, RYBA explained to the recipient of her email that she would be buying roughly 15 kilograms per week or 60 kilograms per month.

8.     In April 2011, defendant BRADLEY, using email account Jason@innovativesmoking.com, exchanged emails with another person about the prices and availability of three chemical substances, one of which was synthetic drug MDPV. In an email dated April 5, 2011, BRADLEY discussed determining "what the demand is in the USA".

9.     In or about May 2011, members of the conspiracy ordered their first kilogram of MDPV from BRADLEY. In or about June or July 2011, the kilogram of MDPV arrived in the United States. The package of MDPV had been hidden inside a cosmetic fingernail dryer to avoid detection by law enforcement. Members of the conspiracy repackaged the kilogram of MDPV into individual gram and half-gram packets, and distributed the packets of synthetic drugs to other members of the conspiracy and others in the United States, including some within the Western District of Virginia.

10.     One member of the conspiracy ("Conspirator B") resided in the Western District of Virginia, where he redistributed the controlled substance analogues. To purchase controlled substance analogues from another member of the conspiracy in the Chicago area for resale in the Western District of Virginia, Conspirator B in 2011 electronically transferred proceeds from the sale of controlled substance analogues in the Western District of Virginia to the other member of the conspiracy ("Conspirator C") based in the Chicago, Illinois area, as payment for the additional controlled substance analogues.

11.     In or about July 2011, members of the conspiracy formed a company called Modern Day Prophet, LLC (MDP), registered in Nevada, which members of the conspiracy used

to conduct transactions associated with the importation and distribution of controlled substance analogues and controlled substances, as well as money laundering transactions. Defendant BUCHANAN and other members of the conspiracy were named as MDP corporate officers. MDP had no lawful business purpose or function.

12. In or about August 2011, members of the conspiracy opened a bank account at Chase Bank under the name Modern Day Profit LLC, with an account number ending 7524. Members of the conspiracy used this bank account to conduct financial transactions associated with the importation, distribution and sale of controlled substance analogues, which included money laundering transactions. Defendant BUCHANAN, Conspirator A and Conspirator C had signature authority on this MDP bank account.

13. In or about August 2011, members of the conspiracy opened another bank account at Chase Bank under the name Modern Day Profit LLC, with an account number ending 7516. Members of the conspiracy used this bank account to conduct financial transactions associated with the importation, distribution and sale of controlled substance analogues, which included money laundering transactions. Defendant BUCHANAN, Conspirator A and Conspirator C had signature authority on this MDP bank account.

14. In the summer and fall of 2011, members of the conspiracy in the United States continued to place orders for increasingly larger amounts of controlled substance analogues from BRADLEY.

15. To ship the controlled substance analogues and controlled substances, BRADLEY, RYBA and other members of the conspiracy used and arranged for the use of DHL, Express Mail Service (EMS), Federal Express, USPS and P.O. Boxes at UPS stores.

16. During this conspiracy, BRADLEY offered and sold insurance for the controlled

substance analogues he obtained in China and shipped to other members of the conspiracy in the United States. If a member of the conspiracy purchased the insurance from BRADLEY and the insured packaged was seized by Customs, BRADLEY would replace the seized package at no cost.

17.     During this conspiracy, the defendants and other members of the conspiracy took affirmative steps to avoid detection by law enforcement. Defendants and members of the conspiracy used "burner phones" (disposable anonymous prepaid cellular telephones) to communicate about issues related to controlled substances and synthetic drugs, used fake names when they communicated with customers, altered their names on packages of controlled substance analogues shipped to one another, rented various P.O. Boxes at UPS stores in various locations to avoid packages being shipped directly to their homes, eventually shifted to a cash-only operation, and took other steps to avoid detection by law enforcement.

18.     To disguise that the controlled substance analogues and controlled substances they imported and distributed were intended for human consumption, members of the conspiracy placed misleading labels on the individual packets of drugs that falsely advertised "not intended for human consumption." Additionally, members of the conspiracy gave the substances misleading names and descriptions, like "Crystaal Bubbly Hookah Cleaner", "bath salts", "research" chemicals, to avoid law enforcement detection.

19.     During this conspiracy, BUCHANAN and other members of the conspiracy coordinated the distribution of controlled substances analogues to others.

20.     During this conspiracy, LISTER and other members of the conspiracy coordinated the distribution of controlled substances analogues to others.

21.     During this conspiracy, PURINTUN and other members of the conspiracy

coordinated the distribution of controlled substances analogues to others. PURINTUN used the false name "Tom" when he communicated with customers to disguise his true identity and avoid detection by law enforcement.

22.    During this conspiracy, NANYA TAYLOR obtained Schedule I controlled substances and controlled substance analogues from other members of the conspiracy and distributed them to others.

23.    During this conspiracy, EDWARD TAYLOR conspired to distribute Schedule I controlled substances and controlled substance analogues from other members of the conspiracy and distribute them to others.

24.    In August 2011, defendant BRADLEY exchanged emails with another member of the conspiracy ("Conspirator D") regarding an order for 4 kilograms of MDPV and 6 kilograms of another chemical.

25.    In September 2011, defendant BRADLEY exchanged emails with Conspirator D regarding an order for 1 kilogram of MDPV and 2 kilograms of another chemical. In this email, defendant BRADLEY demonstrated he had paid for the synthetic drugs by forwarding to Conspirator D an email confirmation BRADLEY had received from his bank, Chase Bank, which showed a wire transfer in the amount $3,080 to "EGBERT CORPORATION LIMITED".

26.    In September 2011, defendant BRADLEY exchanged emails with Conspirator D regarding "PV3". On or about September 26, 2011, BRADLEY was advised that "PV3 is the same as alpha-pyrrolidinopentiophenone." On or about September 27, 2011, the other member of the conspiracy informed BRADLEY that "PV3 is out of stock . . ." BRADLEY wrote back, "Ok ask him to ship me the 4 he has today and wait until after holiday to ship me the pv3. . ." Alpha-Pyrrolidinopentiophenone is another name for α-PVP.

27.    In an email exchange with Conspirator D on September 26, 2011, defendant BRADLEY asked about the "dosage" amount of a certain chemical referred to as "N1". Conspirator D had previously advised defendant BRADLEY that chemical "N1" was designed according to the chemical structure of "M1". BRADLEY wrote that "M1 will be illegal in USA in 10 days", and asked if "N1 is different enough that it will not test positive on a laboratory test for m1." M1 is another chemical name for Methylone, which became a controlled substance in October of 2011. On September 27, 2011, defendant BRADLEY sent an email to Conspirator D and placed an order for 2 kilograms of M1, 1 kilogram of N1, and 1 kilogram of MDPV.

28.    On or about October 21, 2011, MDPV became a Schedule I controlled substance.

29.    On or about October 21, 2011, α-PVP became a controlled substance analogue.

30.    In October of 2011 and December of 2011, defendant RYBA, using email address deborahryba@gmail.com, and a relative of Conspirator A exchanged emails about the packaging and graphic artwork for the "Crystaal Bubbly Hookah Cleaner" packets that members of the conspiracy were importing and distributing. Attached to some of these emails were digital files of the graphics for these packets and other chemicals that members of this conspiracy were importing and distributing. In one email dated October 14, 2011, RYBA wrote "Thanks! Love the artwork! Those 2 with the pics are super sweet! :)"

31.    On December 20, 2011, defendant BRADLEY wrote an email to Conspirator D in which BRADLEY placed an order for 5 kilograms of "Apvp (PV3)", 2 kilograms of lidocaine and other chemicals. BRADLEY instructed, "I need each product bagged into 500 g bags rather than 1kg or larger bags. . . This makes packaging and shipping to USA faster." BRADLEY further explained, "I'll be flying back to china to package and ship to USA conceit (sic) arrives." On December 22, 2011, Conspirator D emailed BRADLEY and advised him that one of the

packages had arrived in the U.S.

32.     In or about December of 2011, law enforcement conducted a controlled purchase of synthetic drugs from Conspirator B in the Western District of Virginia. Subsequent laboratory analysis confirmed that the drugs contained MDPV.

33.     Members of this conspiracy obtained and used lidocaine as a "cutting agent" for the synthetic drugs they imported and distributed in the United States. A cutting agent is another chemical added to the primary drug to increase the volume of substance being sold, and thereby increase the amount of profit. Another reason members of this conspiracy used lidocaine to cut the synthetic drugs was to dilute them. Customers of the conspiracy had complained that the drugs were too strong.

34.     On or about January 5, 2012, defendant BRADLEY sent an email to Conspirator D and placed an order for 6 kilograms of α-PVP and 6 kilograms of lidocaine.

35.     On January 27 and 28, 2012, defendant BUCHANAN exchanged emails with other members of the conspiracy concerning orders of the "Crystaal Bubbly Hookah Cleaner" ("crys" and "Crystaal").

36.     In or about February of 2012, law enforcement conducted a controlled purchase of synthetic drugs from Conspirator B in the Western District of Virginia. Subsequent laboratory analysis confirmed that the drugs contained MDPV.

37.     On or about February 1, 2012, defendant BRADLEY sent an email to Conspirator D and placed an order for 12 kilograms of α-PVP and 4 kilograms of lidocaine.

38.     On or about February 15, 2012, defendant BRADLEY sent an email to Conspirator D and placed an order for 17 kilograms of α-PVP and 4 kilograms of lidocaine.

39.     On or about February 27, 2012, defendant BRADLEY sent an email to

Conspirator D in which BRADLEY explained, ". . . I ship on a Friday for very important reason because packages arrive to usa on weekend when not many customs agents work so they don't inspect as much. . ."

40.     On or about March 2, 2012, defendant BRADLEY sent an email to Conspirator D in which BRADLEY ordered 25 kilograms of α-PVP. BRADLEY also inquired about ordering caffeine powder; as with lidocaine, members of this conspiracy used caffeine powder as a cutting agent to increase the volume of the controlled substance analogues they sold and thereby increase their profit margin.

41.     On or about March 14, 2012, defendant BRADLEY sent an email to moderndayprophetbiz@gmail.com with the subject "Shipments", and identified approximately 16 shipments of synthetic drugs being shipped to defendant BUCHANAN and other members of the conspiracy in the United States.

42.     On or about March 16, 2012, defendant RYBA received an email to deborahryba@gmail.com, in which a relative of Conspirator A communicated an order for 40,000 "Crystaal Bubbly Hookah Cleaner" packages and 10,000 packages of another type. On March 17, 2012, RYBA forwarded that email to defendant BRADLEY at jason@guardianimporting.com. Also on March 17, 2012, RYBA responded to the original email and wrote "thanks!  got it and passed it on! lol  love and miss you too!!!!!!!!!!!!!!!!!"

43.     On or about March 19, 2012, defendant RYBA sent an email to moderndayprophetbiz@gmail.com, with a subject "Shipments SHOULD be delivered today!"  In the email, defendant RYBA outlined various shipments that had been shipped by DHL and USPS.

44.     On or about March 22, 2012, defendants BUCHANAN and LISTER engaged in

Case 5:16-cr-00008-MFU   Document 19   Filed 07/05/16   Page 10 of 26   Pageid#: 100

email communication about pending orders of "Crystaal Bubbly Hookah Cleaner" ("crystal" and "crys").

45.     On or about March 25, 2012, defendant BRADLEY sent an email to Conspirator D about a shipment of 50 kilograms of α-PVP and 6 kilograms of lidocaine.

46.     On or about March 27, 2012, defendant RYBA received an email from artisticoverlay@gmail.com (an email address used by Conspirators C and A) that said "wire 15k in each going to bank tomorrow and wiring u 10.3 n morning".

47.     On or about March 30, 2012, defendant RYBA sent an email to artisticoverlay@gmail.com, with a subject "Next shipments might arrive today.. All are in cinci..All dhl" In the email, defendant RYBA outlined various shipments going to other members of the conspiracy in the United States, including defendant BUCHANAN at "Ryan Buchannan beauty supply" and "R.b. Buchannan."

48.     On or about April 2, 2012, defendant RYBA sent an email to artisticoverlay@gmail.com, with a subject "Shipments via USPS – Today should arrive".  In the email, defendant RYBA identified packages being shipped to defendant BUCHANAN ("ryan bucannan") and other members of the conspiracy in the United States.

49.     On or about April 3, 2012, defendant BRADLEY sent an email to defendant RYBA discussing various shipments going to defendant BUCHANAN ("Buchannan Beauty", "Ryan" and "R.B. Toys") and other members of the conspiracy in the United States.

50.     In or about May of 2012, members of the conspiracy formed another company called Platinum Prophets, LLC (PP) in California to assist with the conspiracy's importation and distribution of controlled substance analogues.  Defendant PURINTUN, Conspirator A and Conspirator C were named as PP corporate officers.

Case 5:16-cr-00008-MFU   Document 19   Filed 07/05/16   Page 11 of 26   Pageid#: 101

51.     On or about May 2, 2012, May 21, 2012 and May 31, 2012, defendant LISTER sent emails to defendant BUCHANAN and other members of the conspiracy concerning shipments of controlled substance analogues.

52.     On or about June 2, 2012, defendant BRADLEY sent an email to Conspirator D in which BRADLEY inquired whether their chemical source would offer "guaranteed shipping to the US." and how much it would cost. BRADLEY explained "This means if taken by customs he would replace the shipments. Does he offer this?"

53.     In or about June of 2012, members of the conspiracy opened a bank account at Chase Bank under the name Platinum Prophet, with account number ending 0802. Defendants LISTER, PURINTUN, Conspirator A and Conspirator C had signature authority on this PP bank account.

54.     In or about June of 2012, defendant RYBA engaged in email communication with Conspirator D concerning the price and availability of various chemicals, including α-PVP. Defendant RYBA forwarded at least one of these emails that addressed α-PVP to defendant BRADLEY on June 28, 2012.

55.     In July of 2012, defendant RYBA exchanged emails with a representative of "Pujiang Victory Cosmetics Co., Ltd." about ultraviolet fingernail lamps. As mentioned above, members of this conspiracy used cosmetic fingernail lamps to avoid detection by law enforcement and Customs by smuggling inside of them the controlled substance analogues and controlled substances. An order form attached to an email shows that defendant RYBA was involved with an order that was placed for 36 cosmetic fingernail lamps.

56.     On July 2, 2012, defendant BRADLEY sent an email to Conspirator D in which BRADLEY discussed an order of 20 kilograms of "PV3" (α-PVP).

57. On July 9, 2012, defendant BRADLEY sent an email to Conspirator D in which BRADLEY ordered 15 kilograms of α-PVP.

58. In or about July 2012, defendant BRADLEY assisted with arrangements for defendant PURINTUN, Conspirator A and Conspirator A's wife to travel to China to obtain synthetic drugs and coordinate shipment of the synthetic drugs to other members of the conspiracy in the United States.

59. On July 10, 2012, defendant BRADLEY sent an email to Conspirator D in which BRADLEY stated "$16750 has been sent from China Construction Hong Kong, for 15kg Apvp. It will be shipped to the Somerset Shenzhen hotel, but tell him not to ship until reservations are made at the hotel. Someone else will be coming there so he still has to book his hotel. The shipment will be shipped in another name . . . Ill give you exact detais (sic) tomorrow when I talk to you. I don't want to email."

60. On July 12, 2012, Conspirator D wrote an email to defendant BRADLEY that said, "they have the box but David has to give the luggage tag they gave to you when you saved there and then he can use or you can write something autorise (sic) him to use to show to the hotel."

61. On or about July 14, 2012, defendant PURINTUN, Conspirator A and Conspirator A's wife traveled to China to obtain the synthetic drugs and arrange for them to be shipped to other members of the conspiracy in the United States.

62. On July 18, 2012, defendant BRADLEY sent an email to Conspirator D in which BRADLEY stated "Tell courier they are room 306. Today, 5pm – don't be late! . . ." Over the next few days, defendant PURINTUN and Conspirator A arranged for the controlled substance analogues to be shipped from China to other members of the conspiracy in the United States. On

July 20, 2012, PURINTUN, Conspirator A and Conspirator A's wife traveled back to the United States.

63.     In July 2012, the DEA and other law enforcement agencies conducted Operation Log Jam, a nationwide law enforcement action directed against those who were manufacturing and distributing synthetic drugs in the United States. Law enforcement arrested more than 90 individuals and seized over five million packets of synthetic drugs. Defendants and other members of the conspiracy had been supplying some of the individuals who were arrested in Operation Log Jam.

64.     After Operation Log Jam, BRADLEY encouraged other members of the conspiracy to use cash instead of electronic banking transactions to avoid detection by law enforcement. As a result, members of the conspiracy started conducting transactions in cash, and the MDP and PP bank accounts were closed by January of 2013.

65.     It was a further part of the conspiracy that defendants BRADLEY, BUCHANAN and other members of the conspiracy, conducted and caused others to conduct financial transactions using proceeds from the sale of controlled substances and controlled substance analogues in the bank accounts identified below to purchase additional controlled substances (which included controlled substance analogues MDPV and α-PVP), including but not limited to the following transactions:

| DATE (approximate) | AMOUNT | FROM | TO | TYPE |
|---|---|---|---|---|
| January 10, 2012 | $11,000 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Cashier's Check obtained, delivered and negotiated into account of Jason Bradley. |
| January 23, 2012 | $26,000 | MDP (IL) J.P. Morgan Chase Bank; | Jason Bradley (AZ) Bank of America; Account No. | Cashier's Check obtained, delivered and |

USAO # 2016

14

| | | Account No. Ending: 7524 | Ending: 2563 | negotiated into account of Jason Bradley. |
|---|---|---|---|---|
| January 31, 2012 | $25,900 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Cashier's Check obtained, delivered and negotiated into account of Jason Bradley. |
| February 16, 2012 | $13,550 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Cashier's Check obtained, delivered and negotiated into account of Jason Bradley. |
| February 16, 2012 | $25,930 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Egbert Co., China | Wire Transfer |
| February 21, 2012 | $12,000 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Jason Bradley (Bank of China) | Wire Transfer |
| March 5, 2012 | $32,000 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Wire Transfer |
| March 5, 2012 | $30,000 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Jason Bradley (Bank of China) | Wire Transfer |
| March 5, 2012 | $30,000 | Ryan Buchanan (IL) Bank of America; Account No. Ending: 1392 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Wire Transfer |
| March 5, 2012 | $44,430 | Jason Bradley (AZ) | Egbert Co., China | Wire Transfer |

| | | | | |
|---|---|---|---|---|
| | | Bank of America; Account No. Ending: 2563 | | |
| March 19, 2012 | $40,000 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (China Construction Bank, Hong Kong) | Wire Transfer |
| March 20, 2012 | $50,000 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7516 | Jason Bradley (China Construction Bank, Hong Kong) | Wire Transfer |
| March 23, 2012 | $70,000 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (China Construction Bank, Hong Kong) | Wire Transfer |
| April 27, 2012 | $15,000 | MDP (IL) J.P. Morgan Chase Bank; Account No. Ending: 7524 | Jason Bradley (AZ) Bank of America; Account No. Ending: 2563 | Wire Transfer |
| January 12, 2015 | $6,770 | RKA Collections, Ltd. DBA Persolvo Group (Jason Bradley); J.P. Morgan Chase Bank; Account No. Ending: 5171 | Shanghai Pudong Development Bank | Wire Transfer |

66.     On or about March 7, 2014, α-PVP became a controlled substance.

67.     In late 2014, Conspirator A and Conspirator C met with defendant BRADLEY in the Chicago, Illinois area multiple times, and communicated about a possible order for 5 kilograms of controlled substances and controlled substance analogues from China. RYBA was present for at least one meeting. BRADLEY explained that the total cost of the order would be

*USAO # 2016*

16

approximately $22,000. During one meeting, BRADLEY, Conspirator A and Conspirator C conducted online research into pending criminal cases against individuals they knew involving controlled substance analogues.

68.   On or about October 2, 2014, defendant BRADLEY composed an email to Conspirator D that said "I need to get some chemicals. Can you contact the guy and get a current list?" Conspirator D asked in response, "What chemicals and quantity?" BRADLEY answered, ". . . Apvp and Methylone but he had many others. . . Find out what he can produce now. The customer wants 5 KG to start out but will decide which chemical once he knows what they can produce and what cost." On or about October 8, 2014, Conspirator D emailed to BRADLEY a list of available substances, including "A-PVP powder", "A-PVP big crystal," and other chemical names. At this time, α-PVP was a Schedule I controlled substance.

69.   On or about October 8, 2014, defendant BRADLEY replied to Conspirator D's email, and attached a list of chemicals with six of the chemicals highlighted. BRADLEY stated "Please open attachment – the ones highlighted please get pricing. Also see the green name I wrote at the bottom to see if he has. The first order would be for a total of 5 kg. . ." Among the highlighted chemicals on the attached list were "A-PVP powder", "a-PVP big crystal" and "Butylone". Later the same day, Conspirator D replied to BRADLEY and provided prices, which included $1,080 per kilogram of α-PVP powder, $1,320 per kilogram of α-PVP big crystal and $1,320 per kilogram of Butylone.

70.   Shortly thereafter, Conspirator A and Conspirator C delivered to defendant BRADLEY in Chicago approximately $14,000 in U.S. currency that included proceeds from the sale of substances in this conspiracy. They owed BRADLEY the remaining balance of approximately $8,000.

71.     On or about December 23, 2014, defendant BRADLEY sent an email to Conspirator D that said, "please confirm price and available for apvp crystal 2kg and butylone crystal 3kg . if no crystal the regular is ok."

72.     On January 12, 2015, defendant BRADLEY sent an email to Conspirator D: "okay $6750 sent from USA so it will come over night tonight and should be in his account tomorrow. . . please confirm with man that he can have the products delivered to my hotel Friday as long as money arrives during Tuesday. its Crystal form of [2] apvp and [3] butylone. 5kg total. . . ask factory to package it very well so that there is no way hotel to know what is inside. it must not smell bad or have any residue outside. I think it's best if he puts bags into box then put first box inside another box. ask him to make sure the bags are strong and not tear easily when I repack."

73.     On or about January 30, 2015, defendant BRADLEY emailed a document titled "commercial invoice" to Conspirator D for shipment back to the United States. In the body of the email, BRADLEY stated, "here Is for big box.. You will see the sender info is from factory in HK so its critical it be sent FROM HK or customs in USA will know better". The attached "commercial invoice" listed the goods being shipped as 10 "Gel Nail Curing lamps (UV)". The consignee was "Schultz Beauty Supply LLC, 502 Sherman st. Downers Grove, ILLINOIS, USA 60515, ATTENTION: DAVID." This was the residential address for a relative of Conspirator A. The country of ultimate destination on the commercial invoice was "USA".

74.     On or about January 30, 2015, defendant BRADLEY emailed another "commercial invoice" to Conspirator D related to another shipment to the United States. In this email, BRADLEY stated "here is for the small box.. either one 0 they are both the same." The attached "commercial invoice" listed goods being shipped as 1 "Fingernail Art lamp" and 5

"Nylon Makeup bag (5 colors)". The consignee was "Chicagoland Powerhouse Wholesalers" at "1042 Maple Ave #189 Lisle ILLINOIS USA – 60532." Country of ultimate destination was "United States." "Chicagoland Powerhouse Wholesalers" was a fictitious business name created by Conspirator C to use instead of his own name when receiving substances in the United States.

75.     In early 2015, Conspirator A received some of the controlled substances they had ordered from defendant BRADLEY and notified Conspirator C. As before, the synthetic drugs were hidden inside cosmetic fingernail dryers. Conspirator A and others repackaged the synthetic drugs into individual "Crystaal Bubbly Hookah Cleaner" packets, and then with Conspirator C redistributed them to others, including to Conspirator B in the Western District of Virginia, and elsewhere.

76.     In early 2015, Conspirator C sold and shipped approximately 500 packages of the "Crystaal Bubbly Hookah Cleaner" to defendant NANYA TAYLOR in North Carolina for redistribution.

77.     On May 24, 2015, defendant RYBA sent a Facebook message to the wife of Conspirator A that said "Hey, Please tell ur hubs he needs to return the money he borrowed from me and jason. We need it and this has be drawn outlong enough."

78.     On June 7, 2015, defendant RYBA sent another Facebook message to the wife of Conspirator A that said, "If your husband doesn't sent my husband the money he borrowed from him, my husband is going to be pissed…So tell him to send it today please. He got the stuff he ordered, and now it's time to pay up. A while ago was the time to pay up." "Jason's called him like 50 times!!! He keeps saying he will send the money.. And then doesn't……Now it's ridiculous.. And me and u have to be in the middle… But he seriously just need to send the money like he said he would a few weeks ago!"

79.     On June 8, 2015, defendant RYBA sent another Facebook message to the wife of Conspirator A that said:

> well since he has avoided calls and texts for 2 weeks this is only way i know to get messages to him. which is ridiculous - I know! but in case you dont know whats up....he came to us asking for help so he could make some money since he spent so much on lawyers. Jason tried to talk him out of it and spent a few hours showing him and his friend online why.. he asked Jason to loan him money to help him out but he wasnt going to do it but I told him to help him out. we went through a lot of shit and jason has spent tons of time dealing with this before he ever even asked dave to pay us back what we loaned. He have not even asked for a dime of profit yet for all the time and the work done but dave hasnt even repaid what he borrowed and right now we are out a lot of money. Money that we need as most of ours is tied up in the business. I NEVER thought he would pull this on family or I wouldnt have told jason to loan him money. its not just the fact that he hasnt paid us back let alone paid us for all the time and work like he agreed....but he lied to us and now has avoided phone calls and texts for about 2 weeks.

80.     In or about July 2015, defendants NANYA TAYLOR and EDWARD TAYLOR attempted to distribute approximately 200 packages of "Crystaal Bubbly Hookah Cleaner" to a confidential informant in North Carolina. Law enforcement arrested defendants NANYA TAYLOR and EDWARD TAYLOR, and seized the 200 packets of "Crystaal Bubbly Hookah Cleaner". Subsequent laboratory analysis of the substance inside the seized packages confirmed the substance contained α-PVP.

81.     In or about September, Conspirator C mailed approximately 40 packets of "Crystaal Bubbly Hookah Cleaner" to a P.O. Box located in Michigan. Subsequent laboratory analysis of these packages confirmed that the packages contained α-PVP.

82.     In or about September and October of 2015, Conspirator C distributed numerous packages of the "Crystaal Bubbly Hookah Cleaner" to a confidential informant (formerly Conspirator B) in the Western District of Virginia. Subsequent laboratory analysis of these packages confirmed that the packages contained α-PVP.

83.     On or about October 7, 2015, law enforcement executed a search warrant at the

residence of Conspirator C.  Law enforcement seized, among other things, a cosmetic fingernail drying lamp that members of the conspiracy had used to smuggle controlled substances into the United States.

84.    All in violation of Title 21, United States Code, Section 846.

## COUNT TWO
### [Conspiracy to Import a Controlled Substance]

85.    From in or about March, 2011, to in or about October, 2015, in the Western District of Virginia, and elsewhere, the defendants,

**JASON BRADLEY,**
**DEBORAH BRADLEY,**
**BRIAN LISTER**
**RYAN BUCHANAN, and**
**NICHOLAS PURINTUN**

knowingly and intentionally conspired with each other and others to knowingly and intentionally import one or more controlled substances (which included one or more Schedule I controlled substances and one or more controlled substance analogues), in violation of Title 21, United States Code, Section 952(a) and 960(a)(1) and (b)(3).

a.    One of the controlled substances was 3,4-methylenedioxypyrovalerone (MDPV), which was a controlled substance analogue as defined in 21 U.S.C. § 802(32), with the intent that it be used for human consumption, as provided in Title 21, United States Code, Section 813, from on or about May 1, 1992, until on or about October 21, 2011, at which time MDPV became a Schedule I controlled substance under the Controlled Substances Act (CSA). 76 Federal Register 65371 (October 21, 2011);

b.    One of the controlled substances was α-Pyrrolidinovalerophenone (α-PVP), which was a controlled substance analogue as defined in 21 U.S.C. § 803(32),

Case 5:16-cr-00008-MFU   Document 19   Filed 07/05/16   Page 21 of 26   Pageid#: 111

with the intent that it be used for human consumption, as provided in Title 21,

United States Code, Section 813, from October 21, 2011 until on or about

March 7, 2014, at which time α-PVP became a Schedule I controlled

substance under the CSA. 79 Federal Register 12938 (March 7, 2014).

All in violation of 21 U.S.C. § 963.

## COUNT THREE
### [Conspiracy to Commit Promotion Money Laundering]

86.    From in or about March, 2011, to in or about October, 2015, in the Western

District of Virginia, and elsewhere, the defendants,

**JASON BRADLEY,**
**DEBORAH BRADLEY,**
**BRIAN LISTER,**
**NICHOLAS PURINTUN and**
**RYAN BUCHANAN**

and others, knowingly and intentionally conspired with each other and with others to commit

offenses against the United States in violation of Title 18, United States Code, Section 1956, to

wit: to knowingly conduct and attempt to conduct a financial transaction affecting interstate and

foreign commerce, which involved the proceeds of a specified unlawful activity, that is,

conspiracy to distribute and possess with the intent to distribute one or more controlled

substances (which included one or more Schedule I controlled substances and one or more

controlled substance analogues, as defined in 21 U.S.C. § 802(32), with the intent that it be used

for human consumption, as provided in Title 21, United States Code, Section 813), with the

intent to promote the carrying on of such specified unlawful activity, that is, conspiracy to

distribute and possess with the intent to distribute one or more controlled substances (which

included one or more Schedule I controlled substances and one or more controlled substance

analogues, as defined in 21 U.S.C. § 802(32), with the intent that it be used for human

consumption, as provided in Title 21, United States Code, Section 813), and that while conducting and attempting to conduct such financial transactions, the defendants knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

## Manner and Means of the Conspiracy

87.     Paragraphs 3 through 84 are hereby incorporated by reference.

88.     All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOUR
### [Conspiracy to Commit International Money Laundering]

89.     From in or about March, 2011, to in or about October, 2015, in the Western District of Virginia, and elsewhere, the defendants,

**JASON BRADLEY,**
**DEBORAH RYBA, and**
**RYAN BUCHANAN**

and others, knowingly and intentionally conspired with each other and with other persons to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit: to knowingly transport, transmit and transfer one or more monetary instruments and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, that is conspiracy to distribute and possess with the intent to distribute one or more controlled substances (which included one or more Schedule I controlled substances and one or more controlled substance analogues, as defined in 21 U.S.C. § 803(32), with the intent that it be used for human consumption, as provided in Title 21, United States Code, Section 813) in violation of Title 21, United States Code, Section 846, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

Case 5:16-cr-00008-MFU   Document 19   Filed 07/05/16   Page 23 of 26   Pageid#: 113

A.    **Manner and Means of the Conspiracy**

90.    Paragraphs 3 through 84 are hereby incorporated by reference.

91.    All in violation of Title 18, United States Code, Section 1956(h).

**Notice of Forfeiture**

1.    Upon conviction of the felony offense(s) alleged in this indictment, the defendants shall forfeit to the United States:

    a.    any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense, pursuant to 21 U.S.C. Section 853(a)(1).

    b.    any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said offenses, pursuant to 21 U.S.C. Section 853(a)(2).

    c.    any property, real or personal, involved in a violation of 18 U.S.C. § 1956, pursuant to 18 U.S.C. § 982(a)(1).

2.    The property to be forfeited to the United States includes, but is not limited to, the following property:

    a.    **U.S. currency in the amount of $295,351.91.**

        On or about April 29, 2013, law enforcement seized approximately $295,351.91, which was in the possession, custody and control of defendants NANYA TAYLOR and EDWARD TAYLOR in the Charlotte, North Carolina area.

    b.    **E*Trade Accounts**

        The United States has identified certain E*Trade accounts, including:

        (1)    Deborah Ryba; account number ending 1350; balance of approximately $100,085.50 as of March 2015;

(2)     Jason Bradley; account number ending 0511; balance of approximately $28,562.24 as of April 2015.

c.    **Bank of America Accounts**

The United States has identified certain Bank of America accounts, including:

(1)     Jason Bradley; account number ending 2563; balance of approximately $35,256.75 as of May 2014.

d.    **J.P. Morgan Chase Accounts**

The United States has identified certain J.P. Morgan Chase accounts, including:

(1)     Deborah B. Ryba; account number ending 7283;

(2)     Deborah B. Ryba; account number ending 8999;

(3)     DJB Industries LLC; account number ending 6797.

e.    **Money Judgment**

Not less than $1,000,000 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate was obtained directly or indirectly as a result of said offenses or is traceable to such property.

3.    If any of the above-described forfeitable property, as a result of any act or omission:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the defendants up to the value of the above-described forfeitable property, pursuant to 21 USC Section 853(p).

A TRUE BILL, this 5th day of July, 2016

S/FOREPERSON<br>
FOREPERSON

JOHN P. FISHWICK, JR.
UNITED STATES ATTORNEY

*USAO # 2016*